ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CLAUDIA QUIROZ (CABN 254419)
ANDREW F. DAWSON (CABN 264421)
CHRIS KALTSAS (NYBN 5490602)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-6753
    Email: claudia.quiroz@usdoj.gov
           andrew.dawson@usdoj.gov
           chris.kaltsas2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>DAVID MILLER and MINNESOTA INDEPENDENT COOPERATIVE,<br><br>    Defendants. | No. CR 15-234 CRB<br>No. CR 16-225 CRB<br><br>**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29 OR, IN THE ALTERNATIVE, FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33**<br><br>Date:  April 19, 2023<br>Time:  1:30 p.m.<br>Judge:  Hon. Charles R. Breyer<br>Place:  Courtroom 6 – 17th Floor |

U.S. OPP'N TO MOT. FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
Case Nos. 15-cr-234 CRB; 16-cr-225 CRB

I

# TABLE OF CONTENTS

I.   Introduction …………………………………………………………………………………...1

II.   Legal Standard ………………………………………………………………………………..1

III.   Argument …………………………………………………………………………………..….2

    A.   Ample Evidence Supports Defendant Miller's Racketeering Conspiracy Conviction..................................................................................................................2

        1.   Defendant Sat atop a Vast Drug Diversion Enterprise …………………………...3

        2.   Defendant Miller Was Associated with and Participated in the Charged Enterprise……………………………………………………………………………….5

    B.   The Court's Correctly Instructed the Jury on The Evidence was More than Sufficient to Sustain Convictions for Mail and Wire Fraud ...............................................6

        1.   The Court Correctly Instructed the Jury that to Establish the Existence of a Scheme or Plan to Defraud, the Government Must Prove Beyond a Reasonable Doubt that the Object of the Scheme Was to Obtain Money or Property from the Alleged Victims…………………………………………………………………………….6

        2.   The Court Correctly Rejected Defendant's Proposed Definition of "Intent to Cheat" and Properly Instructed the Jury on the Intent to Defraud Element of the Mail and Wire Fraud Statutes………………………………………………………………..7

    C.   Ample Evidence Supports Defendant Miller's Money Laundering Conspiracy Conviction...................................................................................................................8

        1.   The Stepanyans and Panda Capital…………………………………………10

        2.   The Stepanyans and B&Y Wholesale, Inc.………………………………………12

        3.   Fernando Galan and Ricardo Jurado………………………………………..14

        4.   Bradley Ludes and the Newport Beach House………………………………15

    D.   There is No Basis for a New Trial Under Rule 33...........................................................16

IV. Conclusion……………………………………………………………………………………16

U.S. OPP'N TO MOT. FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
Case Nos. 15-cr-234 CRB; 16-cr-225 CRB
                            I

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Boyle v. United States*, 556 U.S. 938 (2009) .................................................................................. 3
*Cuellar v. United States*, 553 U.S. 550, 558 (2008) ...................................................................... 13
*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................................................. 1, 2
*Shaw v. United States*, 137 S. Ct. 462, 469 (2016) ........................................................................ 7
*United States v. Abouammo*, 2022 WL 17584238 (N.D. Cal. Dec. 12, 2022) ............................ 12
*United States v. Adegehinti*, 510 F.3d 319, 322-24 (D.C. Cir. 2007) .......................................... 11
*United States v. Bunker*, 532 F.2d 1262 (9th Cir. 1976) ............................................................... 2
*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012) ............................................. 2
*United States v. Gudino*, 432 F.2d 433 (9th Cir. 1970) ................................................................ 2
*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ................................................................ 7
*United States v. Molinaro*, 11 F.3d 853 (9th Cir. 1993) ........................................................... 6, 8
*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) ............................................ 1, 2
*United States v. Nosal*, 844 F.3d 1024, 1039 (9th Cir. 2016) .................................................... 15
*United States v. Pogosian*, 754 F. App'x 545 (9th Cir. 2018) .................................................... 15
*United States v. Rocha*, 598 F.3d 1144 (9th Cir. 2010) ............................................................... 1
*United States v. Tekle*, 329 F.3d 1109 (9th Cir. 2003) .............................................................. 12
*United States v. Walton*, 745 F. App'x 15 (9th Cir. 2018) .......................................................... 9
*United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) ......................................................... 11, 13
*United States v. Xu*, 706 F.3d 965 (9th Cir. 2013) ...................................................................... 9
*United States v. Yossunthorn*, 167 F.3d 1267 (9th Cir. 1999) ..................................................... 2

### FEDERAL STATUTES

18 U.S.C. § 1956 .................................................................................................................... 10, 14

### STATE STATUTES

Section 1956(h) ............................................................................................................................... 8

### FEDERAL RULES

Rule 29 ................................................................................................................................. 1, 2, 16
Rule 33 .......................................................................................................................................... 16

## INTRODUCTION

Defendants David Miller's and Minnesota Independent Cooperative's ("MIC") motion reflects a refusal to engage with the voluminous evidence against them, paired with an attempt to evade clearly applicable law. First, there was ample evidence to support each and every element of Miller's racketeering conspiracy conviction beyond a reasonable doubt. Defendant Miller's description of the evidence presented at trial stands in stark contrast to the record. Indeed, the evidence was compelling and incriminating, and the jury agreed. Second, as to Defendants' convictions under mail and wire fraud, they claim that the Court erred by failing to give their proposed instructions, which lack any basis in established law. Given the overwhelming evidence of Miller's lies and deception, in addition to those of his co-conspirators, the only way for Miller to escape liability for his conduct is to attempt to frame his actions under a novel and unsupported legal framework. The Court should reject those arguments just as it rejected Defendants' proposed instructions. Third, as to Miller's conviction for conspiracy to launder money, the government similarly proved guilt beyond a reasonable doubt, and Defendants' request that the Court substitute its own view of the evidence for the jury's must be rejected.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 ("Rule 29") permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction." Where a jury has returned a verdict, however, courts must accord great deference to the jury's determination. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). Indeed, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). The Ninth Circuit employs "a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence." *United States v. Nevils*, 598 F.3d 1158, 1163-65 (9th Cir. 2010) (en banc) (citing *Jackson*). First, the evidence as presented at trial must be viewed "in the light most favorable to the prosecution." *Id.* at 1164. This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. As such, the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and

must defer to that resolution." *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326). Second, the Court must "determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319) (emphasis in original). "At this second step, however, a reviewing court may not 'ask itself whether it believes that the evidence at the trial established guilt[,] . . . only whether 'any' rational trier of fact could have made that finding[.]" *Id.* (quoting *Jackson*, 443 U.S. at 318-19); *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143-46 (9th Cir. 2012). With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a single witness can be sufficient when reviewing a Rule 29 motion for acquittal. "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury." *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999), as amended (Mar. 31, 1999) (holding that "uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face" (quotation omitted)); *United States v. Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.")

## ARGUMENT

### A. Ample Evidence Supports Defendant Miller's Racketeering Conspiracy Conviction

Defendant Miller was a critical component of a yearslong prescription drug laundering enterprise, one that resulted in hundreds of millions of dollars' worth of illegitimate drugs being dispensed to the unwitting American public. Miller provided the essential drug laundering services—"cleansing" street drugs to make them appear legitimate—without which the scheme could not make a profit. But more than that, he acted as a mentor for junior co-conspirators, as a business and money-laundering advisor for the Stepanyans and others, and as the hub of a broad conspiracy of different drug suppliers.

Despite Defendant Miller's central role in the operations of the enterprise over the course of many years, and his unique position at the center of the flow of fraudulent proceeds (all of which passed through his company's accounts), Defendant argues that there was insufficient evidence to convict him

of racketeering conspiracy. Defendant makes four overlapping challenges to the racketeering conviction. He attacks (1) the existence of an ongoing enterprise, (2) whether the defendant was employed by or associated with the enterprise, (3) whether the defendant conducted or participated in the affairs of the enterprise, and (4) whether the Defendant was part of a pattern of racketeering activity.[1] Overwhelming evidence supports the jury's conclusion as to each of these challenges.

### 1. Defendant Sat atop a Vast Drug Diversion Enterprise

As Defendant notes, the Supreme Court has held that an associated-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Put more succinctly, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* But an enterprise need not have a "hierarchy," "role definition," a "chain of command," or an "internal discipline mechanism." *Id.* at 947 (rejecting these proposed additional "structural requirements").

The Second Superseding Indictment ("SSI") in this matter charged 24 individuals as defendants in the RICO Conspiracy count, in addition to others known and unknown, as comprising the racketeering enterprise. That enterprise was alleged to "constitute[] an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objects of the enterprise." SSI ¶ 30. The SSI labeled the enterprise as the "Karapedyan-Stepanyan Enterprise." *Id.* The enterprise was alleged to have multiple purposes, including "[o]btaining profits and property for its members and associates through the commission of criminal acts, including, but not limited to, . . . mail, wire, and bank fraud, the unlicensed wholesale distribution of drugs, and money laundering." *Id.* ¶ 31. Among the various means and methods of the enterprise, the SSI alleged that the coconspirators "created shell businesses to engage in the sale of improperly procured and handled drugs," "created false drug pedigree information that they sent to customers via mail or email and posted on a web site to facilitate

---

[1] Defendant Miller's argument with regard to the pattern of racketeering activity challenges the validity of the relevant racketeering acts, namely mail and wire fraud and money laundering. The government's response to those underlying challenges will be included in later sections of this Opposition.

U.S. OPP'N TO MOT. FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
Case Nos. 15-cr-234 CRB; 16-cr-225 CRB
3

their sales of improperly procured and handled drugs," and "created documents containing false information, such as fraudulent invoices, false contracts, and other fraudulent business records . . . ." *Id.* ¶ 32.

The evidence at trial proved up the allegations in the SSI. Ample evidence demonstrated how Miller interacted with a variety of different suppliers in order to further the goal of "[o]btaining profits and property . . . through the commission of . . . mail [and] wire . . . fraud, the unlicensed wholesale distribution of drugs, and money laundering." SSI ¶ 31. With regard to the Stepanyans, the evidence established a multi-tier enterprise with low-level suppliers like Karapedyan supplying black market drugs to mid-level suppliers like the Stepanyans, who then used Miller's operation in order to access the legitimate prescription drug market. Agent Shah testified in depth about the nature of the organization, in addition about how one alleged co-conspirator—co-defendant Arman Danielian—explained how the enterprise was structured in order to avoid scrutiny from law enforcement and to have a readymade fall-guy in the event law enforcement grew suspicious. Tr. 1/12/2023 671:20-675:1. Karapedyan, for his part, testified that while he did not deal directly with the Stepanyans, it was his understanding that the Stepanyans were the ultimate purchasers of the drugs he was selling. Tr. 1/17/2023 764:22-766:2.

Defendant disputes the sufficiency of this evidence and argues that the government impermissibly redefined the enterprise as "Miller, MIC, and MIC's suppliers" and thus abandoned the alleged "Karapedyan-Stepanyan Enterprise." Defendant fails to appreciate the difference between a label and a definition. Contrary to common sense, to the jury instructions, and to the allegations in the SSI, Defendant argues that the "Karapedyan-Stepanyan Enterprise" is "the only definition the instructions provided of the charged enterprise." Mot. at 4. That is false. The instructions include thorough guidance on what an enterprise is and what it is not, and how the jury was to assess the evidence before it. The label "Karapedyan-Stepanyan Enterprise" has no definitional power; it is simply a name for the enterprise. To the extent Defendant argues that the name implies a direct relationship between Karapedyan and the Stepanyans, there is no legal requirement that all co-conspirators be in direct contact with one another. On the contrary, the jury instructions made clear that "one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names,

identities, or locations of all of the other members," and that a defendant may still be guilty even if he "did not directly conspire with other conspirators in the overall scheme." Dkt. No. 1832 at 23.

Defendant's attempt to magnify the significance of such a label also conflicts with the actual enterprise that is alleged in the SSI, which was alleged to conduct its business by creating "false drug pedigree information" stored on a website (i.e. MIC's website) and by creating "fraudulent invoices, false contracts, and other fraudulent business records . . . ." As the Court will recognize from trial, these allegations relate directly to Miller's own conduct, which included directing the preparation of false and fraudulent drug pedigrees, phony invoices, and front companies. While Defendant claims the government "redefine[d]" the charged enterprise, he fails to cite to the actual allegations in the SSI. Those allegations demonstrate that Defendant Miller was convicted of the precise charge against him.

### 2. Defendant Miller Was Associated with and Participated in the Charged Enterprise.

As noted in the previous section, the SSI included specific allegations about Defendant Miller's conduct in furtherance of the enterprise. Defendant Miller assisted in the creation of "shell businesses to engage in the sale of improperly produced and handled drugs," SSI ¶ 32(d) (e.g. Panda Capital), directed the creation of "false drug pedigree information" that was "sent to customers via mail or email and posted on a web site to facilitate . . . sales of improperly procured and handled drugs," SSI ¶ 32(e), and "created documents containing false information, such as fraudulent invoices, false contracts, and other fraudulent business records, in order to facilitate" his criminal activities, SSI ¶ 32(f). Despite Defendant Miller's conduct taking such a prominent role in the SSI and in the evidence introduced at trial, he argues that "[n]o rational juror could find beyond a reasonable doubt that Miller was—or agreed to be— employed by or associated with the (nonexistent) K-S Enterprise." Mot. at 5. But overwhelming evidence established at trial each any every relevant allegation in the SSI. Miller *did* assist in the creation of shell business in furtherance of the enterprise. *See* Tr. 1/18/2023 1038:20-1039:9. Miller *did* direct the creation of false pedigree information. *See* Tr. at 1/11/2023 460:16-461:14; Exhibit 88 (email re false pedigree). Miller *did* direct that MIC employees create false contracts and fraudulent invoices. *See id.* at 595:2-597:20; Tr. 1/10/2023 330:20-332:23.

In the face of this evidence, Defendant once again falls back on the uncontested fact that Miller did not have direct contact with all of his co-conspirators. *See* Mot. at 5 (noting that Miller never met Karapedyan or Sarkissians). But this is immaterial. Once again, the law does not require direct contact between all co-conspirators. A defendant may still be guilty even if he "did not directly conspire with other conspirators in the overall scheme." Dkt. No. 1832 at 23.

**B.  The Court Correctly Instructed the Jury on The Evidence, which Was More than Sufficient to Sustain Convictions for Mail and Wire Fraud**

**1.  The Court Correctly Instructed the Jury that to Establish the Existence of a Scheme or Plan to Defraud, the Government Must Prove Beyond a Reasonable Doubt that the Object of the Scheme Was to Obtain Money or Property from the Alleged Victims**

Defendants argue that the Court gave the wrong jury instruction on the scheme to defraud element and that, under their proposed instruction, there would have been insufficient evidence for a conviction. Mot. at 6. Notably, however, defendants do not argue that there was insufficient evidence under the instruction given by the Court set forth below.

Defendants proposed a "Scheme or Plan to Defraud" instruction that would require the government to prove that "the scheme or plan, if completed as intended, would *cause harm to a property interest of the alleged victim*." Dkt. No. 1817 at 17 (emphasis added). The Court rightly rejected the defendants' erroneous proposal, instead instructing the jury that "[t]o establish the existence of a scheme or plan to defraud, the Government must prove beyond a reasonable doubt that the object of the scheme was *to obtain money or property from the alleged victims*." Trial Tr. vol. 8, 1540, January 24, 2023 (emphasis added).

As the government previously argued to the Court, the defendants' proposed instruction was flawed for several reasons. First, the phrase "would cause harm to a property interest" is hopelessly confusing. To the extent defendants wanted an instruction clarifying that the defendants' intent must be to "obtain[] money or property," then that requirement is already included in the pattern instruction. *See* Ninth Circuit Model Criminal Jury Instruction (2010) No. 15.32. Second, to the extent Defendants requested that the jury be instructed to make a finding of ultimate harm, or net financial loss, to a victim, that argument is foreclosed by Ninth Circuit law. *See United States v. Molinaro*, 11 F.3d 853, 863 (9th

Cir. 1993) (endorsing instruction that "a defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense to the crimes charged . . . " ). There is no basis in existing law for defendants' proposed instruction.

At its core, this was a simple case. Defendants lied to their customers about the nature of the prescription drugs they were selling. Defendants' customers paid money for those drugs. It is a classic fraud allegation. The Court rightly rejected Defendants' attempts to overcomplicate an otherwise simple case by confusing the jury as to what the government had to prove. Given the overwhelming evidence of Miller's systemic lies in order to make millions of dollars by selling diverted prescription drugs to unsuspecting victims, Defendants were understandably incentivized to propose a confusing and incorrect instruction that would distract from their guilt. The Court should therefore reject defendants' argument as to the "scheme to defraud" element.

      **2.**      **The Court Correctly Rejected Defendant's Proposed Definition of "Intent to Cheat" and Properly Instructed the Jury on the Intent to Defraud Element of the Mail and Wire Fraud Statutes**

There is no dispute among the parties that the intent to defraud element of the mail and wire fraud statutes requires an intent to deceive <u>and</u> cheat, which is how the Court instructed the jury. Defendants wanted more, however, a heightened standard that is anchored nowhere in the law. Defendants proposed that the jury be instructed that "[t]o prove an intent to cheat, the government must establish that the defendant intended to cause loss or other harm to the alleged victim's money or property." Proposed Instruction No. 13, Dkt. No. 1817, at 21. The Court refused to give that additional instruction, and, on that basis, Defendants now argue that the Court erred in refusing to define *the intent to cheat* as Miller and MIC requested. Mot. at 7. As with the "scheme to defraud" instruction, defendants also argue here that had the Court instructed the jury as they requested, there would have been insufficient evidence to convict. *Id.*

Defendants' proposed instruction is incorrect as a matter of law and was properly rejected. The intent to cheat is not synonymous with an intent to cause harm. Instead, intent to cheat was defined by the Supreme Court in *Shaw* and the Ninth Circuit in *Miller* as to "deprive the victim of money or property" by means of the deception. *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)

1   (citing *Shaw v. United States*, 137 S. Ct. 462, 469 (2016)).  Once again, the pattern instruction already

2   included accurate language regarding the intent to cheat.  Moreover, to the extent Defendants requested

3   that the jury be instructed to make a finding of ultimate harm, or net financial loss, that argument is

4   foreclosed.  *See Molinaro*, 11 F.3d at 863 (endorsing instruction that "a defendant's belief that the

5   victim of the fraud will be paid in the future or will sustain no economic loss is no defense to the crimes

6   charged . . .").

7         On the facts, there was ample evidence to convict, and, on the law, the jury was properly

8   instructed.  During trial, the government presented evidence—through various witnesses and numerous

9   exhibits, that Miller and MIC deprived their victims of money by deception.  The government showed

10  beyond a reasonable doubt that they intended to deceive and cheat (i.e., get money or property as a

11  result).  As the government argued to the jury in rebuttal, what mattered was Miller's intent—based on

12  his experience in the industry, Miller "knew he couldn't go around selling diverted drugs for normal

13  prices or even the MIC discounted prices because nobody wanted them at all at any price. So he had to

14  lie. He had to deceive the customers in order to get their money."  Trial Tr. vol. 8, 1670 (Jan. 24, 2023).

15  As defense counsel argued in closing, Defendants' brief once again reiterates that "Miller and MIC went

16  to great lengths to ensure that the prescription drugs MIC sold were high-quality."  Mot. at 7-8.  The

17  evidence presented at trial showed that Miller lied to his customers because he knew they wouldn't have

18  purchased his medications—regardless of the steep discounts—had they known the source or that they

19  had been taken outside the regulated supply chain.  Miller took a gamble with the health of his

20  customers to make a buck and because he knew they were not going to do it wittingly, he had to lie to

21  them about the source.  The Court should deny Defendants' motion for judgment of acquittal.

**C.   Ample Evidence Supports Defendant Miller's Money Laundering Conspiracy Conviction**

Miller contends that the evidence before the jury was such that no rational juror could have convicted him of conspiring to launder monetary instruments in violation of Title 18, United States Code, Section 1956(h).  Mot. at 8.  These arguments lack merit.

To find Miller guilty of conspiring to launder monetary instruments, the jury must have concluded, beyond a reasonable doubt, that "beginning at least in or about 2009, and ending on or about

U.S. OPP'N TO MOT. FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
Case Nos. 15-cr-234 CRB; 16-cr-225 CRB

8

May 6, 2015, there was an agreement between two or more persons to commit at least one crime of laundering monetary instruments;" and that "[Miller] became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." Dkt. No. 1832 at 37.  The elements of laundering monetary instruments are, first, that "the individual conducted a financial transaction involving property that represented the proceeds of mail and wire fraud; [s]econd, the individual knew that the property represented the proceeds of some form of unlawful activity; and [t]hird, the individual knew that the transaction was designed in whole or in part to conceal or disguise the nature and control of the proceeds." *Id.* at 38.

The evidence presented at trial was more than sufficient to establish, beyond a reasonable doubt, that Miller agreed with numerous parties to launder the proceeds of specified unlawful activities, specifically, the proceeds of the aforementioned mail and wire fraud scheme concerning diverted pharmaceuticals.  Miller clearly conspired with the Stepanyans to launder the proceeds of mail and wire fraud.  Evidence presented at trial also established, however, that Miller conspired with others, including Yusef Yassin, Fernando Galan, Ricardo Jurado, and Bradley Ludes to launder the proceeds of the scheme.

In determining whether there was an agreement between parties to conspire to launder the proceeds of unlawful activity, factfinders need not rely solely on direct evidence.  Indeed, there are seldom cases in which agreements to launder money are plainly spelled out in writing or in speech.  Instead, circumstantial evidence frequently establishes the existence of agreements in conspiracies to launder money.  *See, e.g.*, *United States v. Walton*, 745 F. App'x 15, 16 (9th Cir. 2018) (describing evidence germane to association with specific drug distributors as evincing an agreement to launder the proceeds of drug distribution with those distributors); *United States v. Xu*, 706 F.3d 965, 982 (9th Cir. 2013) (holding that circumstantial evidence is relevant to determining the existence of an agreement to launder the proceeds of criminal activity).  To that end, circumstantial evidence presented at trial proved the existence of agreements to launder money in this case.

Preliminarily, for the reasons stated above and on the record at trial, the government satisfied its burden of proof with respect to the mail and wire fraud counts of the Second Superseding Indictment.

1  Accordingly, because the government showed at trial that the funds transferred in connection with the
2  money laundering counts described herein involved funds generated from Miller's and others' mail and
3  wire fraud scheme, they are "proceeds" for purposes of the money laundering conspiracy count
4  discussed below. *See* 18 U.S.C. § 1956(a)(1); Dkt. No. 502 ¶¶ 53-54; Trial Exhibit ("Tr. Ex.") 789,
5  Excel Financials Spreadsheet, "Final Summary Tab."  The government addresses the balance of Miller's
6  arguments below, focusing on each of the separate money laundering agreements Miller contests, along
7  with evidence of Miller's acquiescence to those agreements; his knowledge that the transactions
8  involved the proceeds of mail and wire fraud; and the purpose of the transactions Miller facilitated, to
9  wit, concealment of the proceeds of fraud.

### 1. The Stepanyans and Panda Capital

The evidence presented at trial clearly establishes that Miller agreed with various parties to launder the proceeds of his drug diversion scheme.  One of those agreements to launder funds was made apparent in Rami Houchan's testimony.  Mr. Houchan testified as to Miller's involvement in the Stepanyans' creation of Panda Capital, an entity that had no purpose apart from laundering the proceeds of Miller's and the Stepanyans' drug diversion scheme.  Mr. Houchan testified that his involvement in the money laundering scheme began when the Stepanyans took an apparent interest in his financial and personal well-being and expressed a purported desire to help Mr. Houchan begin a small business.  Tr. 1/18/2023 at 1035:22-1037:11.  But as Mr. Houchan testified, the Stepanyans merely planned to use his name on bank accounts to shield themselves from potential law enforcement scrutiny when those bank accounts would be used to funnel the proceeds of the aforementioned drug diversion scheme without alerting Mr. Houchan as to where those proceeds came from.  *Id.* at 1051:4-1054:14.  When Houchan was told to go to a lawyer's office to establish ownership over bank accounts and the corporate entity Panda Capital, Miller was the attorney coordinating with the Stepanyans, Houchan, and one of Miller's associates to ensure that money would flow from the E-Tail Network, one of Miller's many companies, to the Stepanyans to the tune of hundreds of thousands of dollars.  *See id.* at 1038:23-1041:8.  Later financial analysis showed that, after the incorporation of Panda Capital, funds began flowing through Panda Capital accounts from the E-Tail Network to the Stepanyans.  *See* Tr. Ex. 789, Excel Financials

1  Spreadsheet, at Tabs 5, 6, "Final Summary."

2      Mr. Houchan's testimony provided ample evidence from which a rational juror could conclude beyond a reasonable doubt that Miller and the Stepanyans mutually arranged to have money from MIC flow through Panda Capital to pay the Stepanyans for pharmaceuticals they provided to Miller.  As a company, Panda Capital served no discernable purpose apart from holding money in a corporate entity that held no association with either of the Stepanyans—essentially textbook money laundering activity. *See, e.g.*, *United States v. Wilkes*, 662 F.3d 524, 547 (9th Cir. 2011) (explaining that money laundering transactions are generally "'convoluted,' rather than 'simple transactions that can be followed with relative ease, or transactions that involve nothing but the initial crime'", all of which includes the creation of "additional buffers between the corrupt [activity] and the [destination accounts]" in a transaction) (quoting *United States v. Adegehinti*, 510 F.3d 319, 322-24 (D.C. Cir. 2007)).  The Stepanyans and Miller continued their money laundering activity and, indeed, built upon it by varying the corporate entities they dealt with after Panda Capital was no longer accessible to the Stepanyans. The Stepanyans changed their own entities numerous times, changing the entities' states of incorporation to Nevada, and eventually, in the case of GC National Wholesale, used an entity that was opened under an assumed identity.  *See* Tr. 1/17/2023 at 770:16-772:7, 814:8-15.  This evidence establishes that Miller agreed with the Stepanyans to conduct several financial transactions using, among others, the Panda Capital account, and that those financial transactions would transmit the proceeds of Miller's proceeds of mail fraud and wire fraud to the Stepanyans in a manner designed to conceal the nature, origin, source, and control of proceeds from others.

    Moreover, there is evidence that Miller knew that these transactions were designed to conceal the nature, origin, source, and location of these proceeds. Miller's involvement in the creation of Panda Capital was substantial—he provided the associate and the venue to the Stepanyans and Mr. Houchan, and later transferred hundreds of thousands of dollars to the Stepanyans through Panda Capital as payment for the drugs the Stepanyans provided, all while directing MIC's employees to facilitate these transactions.  Tr. 1/18/2023 at 1035:22-1037:11; 1038:23-1041:8. This all occurred despite Miller knowing that Mr. Houchan's name was on the Panda Capital accounts, which can be surmised through

1  Miller's participation in the company's incorporation.

2  All of these facts evince Miller's knowledge that he was involved in a scheme to conceal the source, origin, nature, and control of the funds he paid to the Stepanyans. Contrary to Miller's assertions, there is no requirement that money laundering take the form of purchasing gold with illicit proceeds, or scheming to receive suitcases full of cash at barbershops—although there was evidence that the Stepanyans were engaged in such conduct here after Miller's initial money laundering activity occurred. The transactions routed through Panda Capital were themselves unnecessarily convoluted, and lacked a discernable purpose apart from concealing the nature, source, ownership, location, or control of the proceeds of Miller's and the Stepanyans' criminal activities. Ultimately, Panda Capital served as nothing but a buffer between MIC and the Stepanyans, and that is a common form of money laundering. *See United States v. Abouammo*, 2022 WL 17584238, at *16-17 (N.D. Cal. Dec. 12, 2022) (discussing what constitutes a money laundering transaction) (Chen, J.). The fact that Miller used wires to accomplish this laundering is of no importance—rather than take the route of converting these funds into cash or gold, Miller simply sought another route to hide the nature, source, ownership, and control of these funds using shell companies. *See United States v. Tekle*, 329 F.3d 1109, 1113-14 (9th Cir. 2003) (establishing that "transactions in question were open, notorious, and did not disguise defendant's identity" does not overcome a money laundering charge, as "[t]he necessary concealment . . . is that of the *source* of funds, not the identity of the money-launderer.") (emphasis added) (citations omitted)).

Accordingly, at trial the government presented evidence from which a rational juror could conclude, beyond a reasonable doubt, that Miller conspired with the Stepanyans to conceal the nature, source, ownership, and control of the proceeds of mail and wire fraud through his participation in creating Panda Capital.

### 2. The Stepanyans and B&Y Wholesale, Inc.

Miller's and the Stepanyans' money laundering efforts eventually evolved when Miller injected B&Y Wholesale into the standard payment processing path between MIC and the Stepanyans' various entities. As explained further below, Miller essentially operated B&Y Wholesale with MIC employees. Given B&Y Wholesale's role in the transaction (i.e. a buffer between MIC and the Stepanyans), this

evidence evinces Miller's clear knowledge that he had engaged in money laundering. More saliently here, Miller's activities with respect to B&Y Wholesale indicate that Miller entered into an agreement with the Stepanyans to use B&Y Wholesale as a shell company to shield the transfer the proceeds of their illicit activities between one another.  Specifically, at trial, the government presented evidence that B&Y Wholesale was eventually exclusively used to pay the Stepanyans, and, later in the conspiracy, *only* the Stepanyans. Tr. Ex. 789, Excel Financials Spreadsheet, at Tabs 13-17, 31-55, "Final Summary."  Moreover, Miller and MIC were in total and complete control of B&Y Wholesale. Testimony at trial established that MIC employees Marie Polichetti and Jeanette Couch were the ones who, for the most part, determined when B&Y Wholesale would pay the Stepanyans, and when B&Y Wholesale itself would receive money from MIC. Tr. 1/23/2023 at 1249:14-1250:3. B&Y Wholesale's purported owner, Yusef Yassin, testified that he was paid to do nothing but act as an owner on corporate paper, as Miller and MIC pulled the levers and authorized payment to the Stepanyans, among other drug diverters. *Id.* at 1259:3-9.

Furthermore, B&Y Wholesale's presence in the transactions between MIC and the Stepanyans' entities had no readily apparent legitimate business purpose.  Instead, the evidence indicated that, apart from laundering funds, the purpose of sending funds through B&Y Wholesale was to insert a purported authorized distributor into the transaction stream to transactions between Miller and the Stepanyans' entities appear legitimate and legally sound.  This activity clearly establishes an intent to launder the proceeds of Miller's and the Stepanyans' mail and wire fraud conspiracy. *See Wilkes*, 662 F.3d at 547 (explaining that creating buffers between payees and payors, and "taking steps to make funds appear legitimate" is clear money laundering) (quoting *Cuellar v. United States*, 553 U.S. 550, 558 (2008)).

Miller's agreement with the Stepanyans is further evidenced by his role as the ultimate overseer for this payment structure; among other things, Miller changed B&Y Wholesale's payees whenever the Stepanyans' corporate entities changed, despite purporting that B&Y Wholesale was an independent entity.  That simultaneous change indicates close coordination and agreement between Miller, MIC, and the Stepanyans to ensure that the illicit proceeds of their coordinated operation made it into accounts that the Stepanyans had designated to Miller.  At the very least, the simultaneous change reflects constant

communication between the Stepanyans and Miller concerning how money should flow from MIC, to B&Y Wholesale, to whichever corporate entity the Stepanyans decided would receive criminal proceeds on that particular occasion.

Miller agreed to launder funds for the Stepanyans through B&Y Wholesale, and his subsequent manipulation of B&Y Wholesale to direct funds to the Stepanyans from MIC by inserting another layer of obfuscation between MIC and the Stepanyans. The government accordingly presented overwhelming evidence from which a reasonable juror could conclude, beyond a reasonable doubt, that Miller conspired with the Stepanyans to launder the proceeds of mail and wire fraud.

### 3.    Fernando Galan and Ricardo Jurado

Evidence at trial firmly established that Miller also agreed with Ricardo Jurado and Fernando Galan to conceal the proceeds of their respective involvement in Miller's mail and wire fraud scheme. Although Galan noted that Jurado used his various accounts as a means of "getting paid," transactions may still have multiple purposes and still constitute money laundering. *See* 18 U.S.C. § 1956(a)(1)(B) (specifically applying to transactions "designed in whole *or in part*" to launder the proceeds of specified unlawful activities (emphasis added)). And indeed, in addition to using Jurado's various accounts as payment, Miller helped Jurado use accounts in various names, and in various countries, to conceal payments connected to the distribution of diverted drugs between MIC and Jurado, with Galan's assistance. Payments to Jurado were frequently split among his many accounts, none of which bore a facial connection to Jurado or to Galan. Tr. 1/11/2023 at 602:4-20. Moreover, several of his accounts were overseas in locations like Mexico. Tr. 1/11/2023 at 600:12-22; Tr. Ex. 588. None of the accounts bore the corporate entity name that Galan knew and that Jurado advertised to Miller, BR Enterprises. Tr. 1/11/2023 at 598:19-599:5.

Miller also used the same strategy to accomplish payment to Jurado as he did the Stepanyans. Namely, Miller used corporate entities that bore no obvious connection to Jurado to pay Jurado for diverted drugs. Further, Miller put Jurado on his payroll to "appear more legit" as a pharmaceutical wholesaler. Tr. 1/11/2023 at 597:21-598:10. Miller also frequently dealt with Jurado by transaction through Galan, adding yet another buffer with no discernable business purpose apart from concealing

Miller's and Jurado's involvement in their transactions. All of these facts constitute evidence from which a reasonable juror could conclude, beyond a reasonable doubt, that Miller agreed with Jurado to knowingly design their transactions in a manner that would conceal the nature, source, location, ownership, and control from others investigating those transactions.

### 4. Bradley Ludes and the Newport Beach House

Finally, defendant asserts that the government failed to establish that Miller agreed with Bradley Ludes to launder the proceeds of Miller's mail and wire fraud into Miller's home and renovations in Newport Beach. Defendant's reliance on Ludes' denial that he specifically agreed to launder money for Miller, however, falls short. The government did not need to prove direct evidence of a conspiracy between Miller and Ludes to succeed at trial. Rather, circumstantial evidence showing that a co-conspirator failed to investigate a situation in which there was a "high probability" that funds were the proceeds of a form unlawful activity, and that conspirator "deliberately avoided learning the truth" is sufficient to convict a defendant on a money laundering conspiracy count. *See United States v. Pogosian*, 754 F. App'x 545, 547 (9th Cir. 2018) (citing *United States v. Nosal*, 844 F.3d 1024, 1039 (9th Cir. 2016)).

In this case, the circumstantial evidence that the funds Miller sent to Ludes were the product of illicit activity was overwhelming. Ludes' company received wires from various companies, including one Ludes knew Miller managed (MIC), and another from B&Y Wholesale, which Ludes knew little about. Tr. 1/23/2023 at 1355:6-19, 1358:9-22. Ludes received hundreds of thousands of dollars from Miller, which far exceeded the average investment he received from other individuals with which Ludes worked. Tr. 1/23/2023 at 1373:13-24. Unlike Miller, Ludes' other investors actually used their money to invest in real estate. Tr. 1/23/2023 at 1373:25-1374:6.

Moreover, instead of investing those funds in real estate per Miller's original instructions, Ludes used the funds Miller transferred to him to pay for Miller's own expenses. Those expenses included paying down a mortgage on, and investing in property renovations in, Miller's home in Newport Beach, none of which came with an explanation from Miller as to why Ludes was handling these payments for him. Tr. 1/23/2023 at 1365:2-1376:11. None of those relate to real estate investment, which was the

purported reason as to why the initial transfers from MIC and B&Y Wholesale were initially made. Tr. 1/23/2023 at 1370:5-1371:12.

In sum, there was a high probability that the funds entering Ludes' account were from some form of unlawful activity. Rather than use Ludes to invest funds, Miller's funds simply sat with Ludes indefinitely. Those funds came from various companies, in staggeringly high amounts, with little context as to what these companies were or what Miller's relationship to them was. Finally, the funds were used not to invest in real estate, but to transact in a manner that Miller could have easily done himself, rendering Ludes' involvement in these transactions pointless, except to serve as a buffer between Miller and the property Miller had purchased. The purpose of Ludes' role in these transactions was clear—he, like B&Y Wholesale, Panda Capital, and other companies served as a buffer between Miller's illicit activities and the placement of the proceeds of his illicit activity into the financial system. Moreover, Ludes' role was part of Miller's well-established *modus operandi* at the time Miller engaged Ludes' services. Miller had performed these sorts of transactions time and time again. If Ludes did not know where this money came from, it was clear that that was the result of his failure to investigate the source of the funds notwithstanding clear signs that it came from illicit activity.

Accordingly, with respect to Miller's transactions with Ludes and the Newport Beach house, the government presented evidence from which a reasonable juror could conclude, beyond a reasonable doubt, that Miller had agreed with Ludes to launder the funds of his mail and wire fraud. The Court should accordingly reject Miller's arguments to the contrary.

**D.    There is No Basis for a New Trial Under Rule 33**

Defendants' last effort is to repackage their various arguments into a request for a new trial under Rule 33. Motion at 11. Defendants David Miller and MIC were proven guilty beyond a reasonable doubt on all offenses. The evidence was overwhelming. While Defendants allude to a potential "serious miscarriage of justice" that would weigh against a verdict, they provide no argument or explanation as to why that would be the case even if the Court finds that there is sufficient evidence to sustain a verdict. Defendants' efforts to downplay the evidentiary record, combined with a failure to recognize the overwhelming evidence against them, must be rejected under both Rule 33 and Rule 29.

**CONCLUSION**

For the foregoing reasons, Defendants motion should be denied.

DATED: March 22, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

      /s/
ANDREW F. DAWSON
CLAUDIA QUIROZ
CHRIS KALTSAS
Assistant United States Attorneys

U.S. OPP'N TO MOT. FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
Case Nos. 15-cr-234 CRB; 16-cr-225 CRB

17