John D. Cline (State Bar No. 237759)
cline@johndclinelaw.com
LAW OFFICE OF JOHN D. CLINE
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435

K.C. Maxwell (State Bar No. 214701)
kcm@kcmaxlaw.com
MAXWELL LAW PC
23 Geary Street, Suite 600
San Francisco, CA 94108
Telephone: (415) 494-8887
Facsimile: (415) 749-1694

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>ARA KARAPEDYAN et. al.<br><br>Defendant(s). | Case No.: 3:15-cr-0234-CRB<br>Case No.: 3:16-cr-225-CRB<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29 OR, IN THE ALTERNATIVE, FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33**<br><br>Date: April 19, 2023<br>Time: 1:30 p.m.<br>Judge: Hon. Charles R. Breyer<br>Place: Courtroom 6--17th Floor |

Defendants David Miller and Minnesota Independent Cooperative, Inc. submit this reply in support of their motion under Fed. R. Crim. P. 29 and 33 for judgment of acquittal or, in the alternative, for a new trial.

# ARGUMENT

## I.     COUNT 1 (RICO CONSPIRACY).

An indictment must, among other functions, "furnish the defendant with a sufficient description of the charges against him to enable him to prepare his defense." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); *see, e.g., Russell v. United States*, 369 U.S. 749, 763 (1962). Count 1 informed Miller that he should prepare to defend against a RICO conspiracy charge centered on the "Karapedyan-Stepanyan Enterprise." According to the indictment, the "Karapedyan-Stepanyan Enterprise" was a vast criminal organization that included many people and engaged in a wide variety of crimes. Doc. 502 at 15-19, ¶¶ 30-33. Miller structured his defense, including his cross-examinations and closing argument, to meet the charge that he had agreed to participate in *that* enterprise--the "Karapedyan-Stepanyan Enterprise"--through a pattern of racketeering activity. But the government's proof of the K-S Enterprise failed, for the reasons outlined in Miller's motion. Doc. 1857 at 2-5. And so, beginning with its closing arguments and continuing in its response to defendants' Rule 29 motion, the government abandoned that enterprise and switched to an uncharged Miller-MIC enterprise, allegedly consisting of Miller, MIC, MIC's employees, and MIC's suppliers. *E.g.*, T. 1/24/23 at 1549, 1553, 1582-90, 1660, 1681; Doc. 1857-1 at 68.

The government has played a shell game with the RICO charge. It obtained enormous tactical advantages by charging the sprawling K-S Enterprise. For example, the government was able to join as defendants in a single indictment persons who had nothing to do with Miller and MIC and never could have been joined if the RICO count had charged a Miller-MIC enterprise.[1] Similarly, the RICO charge based on the K-S Enterprise allowed the government to join in a single indictment otherwise unrelated criminal offenses--including conspiracy to commit identity theft, conspiracy to commit access device fraud, and conspiracy to commit murder-for-hire--that never could have been joined to an indictment with a RICO charge based on a Miller-MIC enterprise. And, on the theory that it needed

---

[1] These defendants included, for example, Gevork Ter-Mkrtchyan, Khachig Geuydijian, Arman Petrosyan, Lanna Karapedyan, Maxwell Starsky, Sevak Gharghani, Jean Dukmajian, Karine Dukmajian, Angela Dukmajian, Asatour Magzanyan, Tigran Sarkisyan, Hripsime Khachtryan, Loui Artin, Hugo Marquez, Arman Zargaryan, Dmitriy Kustov, Michael Inman, Araxia Nazaryian, Cheryl Barndt, Eric Figueroa, Marc Asheghian, Michael Asheghian, Ararat Yesayan, and Ilia Nalbans.

to prove the broad K-S Enterprise, the government obtained admission at the Miller and MIC trial of evidence that never would have been allowed if the RICO count had charged a Miller-MIC enterprise.[2] But when it turned out the government could not prove the existence of the "Karapedyan-Stepanyan Enterprise," it dismissed that description--*the only description of the charged enterprise the jury received*--as a meaningless "label" and switched to an uncharged Miller-MIC enterprise in closing argument and now in defense of the verdict.

The government notes that the jury received instructions on the legal definition of a RICO enterprise. Doc. 1920 at 4. But because the jury did not receive the indictment, the only information it had on the scope of the enterprise *charged in the indictment* was the Court's description of it as "the Karapedyan-Stepanyan enterprise." T. 1/24/23 at 1532. The government urged the jury to disregard that description and to rely instead on an uncharged Miller-MIC enterprise.

In short, having obtained tactical advantages by charging the "Karapedyan-Stepanyan Enterprise," the government obtained and now wants to preserve the guilty verdict based on an uncharged Miller-MIC enterprise. The legal term for the government's shell game is "constructive amendment." By abandoning the "Karapedyan-Stepanyan Enterprise" charged in the indictment and replacing it with an uncharged Miller-MIC enterprise, the government invites the Court to amend the charge returned by the grand jury--a legal sin so serious that it warrants reversal without an inquiry into harmless error. *See, e.g., United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002); *United States v. Frega*, 179 F.3d 793, 817 n.1 (9th Cir. 1999).[3] The Court should reject the government's

---

[2] That evidence included, for example, virtually all of Agent Shah's testimony about his dealings with Karapedyan; all of Karapedyan's testimony except the portion where he described furnishing prescription drugs to Yan German; Houchan's testimony about the threats he endured from the Stepanyans and about his money laundering for the Stepanyans; and Sarkissian's testimony about his money laundering for the Stepanyans. Defendants moved pretrial to exclude evidence unrelated to Miller and MIC, Doc. 1545, but ultimately acknowledged, given the breadth of the charged enterprise, that some such evidence was admissible. If the government had charged the Miller-MIC enterprise that it argued to the jury in closing, the defense would have urged exclusion of all the evidence described above.

[3] Even if the government's switch in enterprise theories were deemed a variance rather than an amendment, the evident prejudice to Miller--including both his inability to prepare to meet the Miller-MIC enterprise theory announced for the first time in closing argument and the admission of evidence relevant only to the alleged K-S Enterprise--would require reversal. *See, e.g., Adamson*, 291 F.3d at 616.

1  effort to rewrite the RICO conspiracy charge that the grand jury returned.  The question is whether
2  the government presented sufficient evidence to support the grand jury's charge--the charge against
3  which Miller prepared to defend--not a different charge that the grand jury never considered.

4  The answer to that question plainly is no.  As explained in the defense motion, the government
5  failed to prove the existence of the alleged "Karapedyan-Stepanyan Enterprise."  The alleged
6  principals--Karapedyan on one hand and the Stepanyans on the other--did not know each other.[4]  The
7  most that can be said about them is that Karapedyan sold prescription drugs to Yan German, which
8  he "assum[ed]" and "kind of knew" German sold to the Stepanyans.  T. 1/17/23 at 765-66.  The
9  government presented no evidence that the alleged K-S Enterprise had any "ongoing organization,
10 either formal or informal."  T. 1/24/23 at 1532-33.  Nor did it present evidence that Miller was (or
11 agreed to be) employed by or associated with any such enterprise, or that he participated (or agreed
12 to participate) in its affairs through a pattern of racketeering activity.  The government's response on
13 each of these elements rests on the faulty premise that the enterprise at issue was an uncharged Miller-
14 MIC enterprise, not the "Karapedyan-Stepanyan Enterprise" actually charged in the indictment.  Doc.
15 1920 at 4-6.

## II.    COUNTS 2 THROUGH 12 (MAIL AND WIRE FRAUD).

17  On the fraud charges, the government does not contend that the evidence was sufficient on the
18 scheme to defraud and intent to defraud elements *under the defendants' view of the law*.  It argues
19 instead that the defendants' legal position has "no basis in existing law" and "is anchored nowhere in
20 law." Doc. 1920 at 7.  We recognize, of course, that the Court has ruled against us on these issues in
21 the context of the jury instructions.  But we disagree that the defense view has no support.  To the
22 contrary, one federal case after another has recognized that harm to the victim's property rights must
23 be either part of an intent to defraud or the object of the scheme to defraud.

---

[4] The government notes that there is no requirement that all conspirators know each other.  Doc. 1920 at 4-5.  Whether correct or not in this context, the point is irrelevant.  The central question is whether the government proved the existence of the "Karapedyan-Stepanyan Enterprise" charged in the indictment.  It is highly relevant on that question that the named principals, Karapedyan on one hand and the Stepanyans on the other, never met or communicated with each other during the period the enterprise allegedly existed.

For example, the Second Circuit has held that "[o]nly a showing of intended harm will satisfy the element of fraudulent intent," and "it is error for a trial judge to charge a jury that contemplated harm is *not* an element of fraudulent intent." *United States v. Starr*, 816 F.2d 94, 98, 101 (2d Cir. 1987) (emphasis in original); *see United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) ("[T]he government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was *contemplated* by the schemer.") (emphasis in original). The D.C. Circuit has found "a judicial consensus . . . [that] the scheme to defraud must threaten some cognizable harm to its target." *United States v. Lemire*, 720 F.2d 1327, 1335-36 (D.C. Cir. 1983). The Fourth Circuit has upheld a jury instruction that, for purposes of the wire fraud statute, an intent to defraud requires a "purpose of causing some financial or property loss to another." *United States v. Allen*, 491 F.3d 178, 187 (4th Cir. 2007). A standard jury instruction manual similarly provides that, for mail and wire fraud, an intent to defraud requires "the purpose of causing some financial or property loss to another." 2 Sand et al., *Modern Federal Jury Instructions*, Instruction 44-5. The Ninth Circuit has not specifically addressed the loss issue, but it cited each of these authorities with apparent approval in *United States v. Miller*, 953 F.3d 1095, 1102 (9th Cir. 2020). *See also, e.g., Kelly v. United* States, 140 S. Ct. 1565, 1573 & n.2 (2020) ("[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."); *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) ("To be guilty of fraud, an offender's purpose must be to injure, a common-law root of the federal fraud statutes.") (quotation and citations omitted). As these and other authorities show, it is the government's position that rests on shaky legal ground, not the defendants'.

The government notes that a defendant's belief the victim will be repaid in the future is not a defense to mail or wire fraud. Doc. 1920 at 6, 8 (citing *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993)). As the Second Circuit has explained, however, there is no inconsistency between this principle and the requirement that a scheme to defraud have as its purpose harm to the victim's money or property: "[T]he point that [an instruction based on the principle stated in *Molinaro*] seeks to convey is that where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so

the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct." *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998).  In other words, if the defendant intends to cause financial or property loss to his victim, or if his scheme has such harm as its object, it is no defense that the defendant hoped he could make the victim whole at some point in the future.  Miller and MIC, of course, did not argue at trial and do not argue here that they intended to harm MIC's customers but believed they would "ultimately be able to work things out" so the customers suffered no loss; they maintain (and the evidence shows) that they did not contemplate causing financial or property loss in the first place.  Accordingly, the *Molinaro* principle has no bearing here.

The government tacitly concedes that there is no evidence from which a rational jury could find beyond a reasonable doubt that Miller or MIC intended to cause financial or property loss to MIC's customers or that the object of their alleged scheme was to cause such loss.  Doc. 1857 at 6-7.  Under what we contend is the correct view of the law, therefore, judgment of acquittal must be entered on the fraud counts (Counts 2 through 12).  And because mail and wire fraud are the racketeering acts underlying the RICO conspiracy charge (Count 1) and the source of the alleged proceeds in the money laundering conspiracy charge (Count 13), judgment of acquittal must be entered on those counts as well.

### III.     COUNT 13 (MONEY LAUNDERING CONSPIRACY).

The government's effort to salvage the money laundering conspiracy (Count 13) founders most obviously on the agreement element.  There is ample evidence that the Stepanyans were engaged in money laundering.  Perhaps Jurado was too.  But there is insufficient evidence from which a rational jury could find beyond a reasonable doubt that Miller *agreed* with them to launder money. All of the transactions at issue, with the exception of the beach house transactions (discussed below), involved MIC wiring money, in its own name, either directly to its suppliers or to B&Y and then to suppliers, to pay for prescription drugs that the suppliers had provided.  That MIC or B&Y wired the

payments into various bank accounts designated by the suppliers does not suffice to show an agreement with the suppliers to launder money.[5]

### A. Panda.

The government points to Houchan's testimony as evidence that Miller agreed with the Stepanyans to launder money. Doc. 1920 at 10-11. But neither Houchan nor John Tran (Miller's associate, who attempted to help Houchan set up Panda but could not because he was not licensed to practice law in Nevada) provided any such testimony. Houchan did not recall any conversation with Miller, at the meeting where Miller introduced him to Tran or afterward. T. 1/18/23 at 1041, 1073 (Houchan). Indeed, when he met with Miller, Houchan did not yet know that the Stepanyans would use Panda to launder money; he thought the company was for an electronics business he was starting with them. T. 1/18/23 at 1037-46. Tran (whose testimony was in the form of a stipulation) similarly said nothing to suggest that Panda was created to launder money. T. 1/24/23 at 1490-91. And there was not a shred of other evidence suggesting that Miller viewed Panda as a money laundering device.[6]

### B. B&Y.

The government notes that "the purpose of sending funds through B&Y Wholesale was to insert a purported authorized distributor into the transaction stream to [make] transactions between Miller and the Stepanyans' entities appear legitimate and legally sound." Doc. 1920 at 13. That was indeed the government's theory at trial ("drug laundering," in the government's phrase, T. 1/24/23 at 1659), and Yassin's testimony, if believed, provided support for that theory. But neither Yassin's testimony nor any other evidence supports the government's further theory that Miller's purpose in using B&Y was *also* to launder money. And there is certainly no evidence of an agreement between Miller and Yassin, the Stepanyans, or anyone else to use B&Y for that purpose.

---

[5] As explained in the initial motion (Doc. 1857 at 10-11), Miller also disputes the sufficiency of the evidence on the knowledge and proceeds elements of the money laundering conspiracy count.

[6] The government asserts that knowledge of Panda's use for money laundering "can be surmised through Miller's involvement in [Panda's] incorporation." Doc. 1920 at 11-12. But Miller had *no* involvement in Panda's incorporation. He referred Houchan to Tran, and Tran discovered he could not help because he was not licensed in Nevada--so he referred Houchan to a lawyer who was. T. 1/24/23 at 1490-91. Nothing about Miller's knowledge of Panda's purpose can be "surmised" from those events.

### C. Galan and Jurado.

The government points to no evidence that Miller conspired with either Galan or Jurado to launder money. *Jurado's* motive for requesting that payments for prescription drugs be wired to various accounts might (or might not) have been to conceal some aspect of his transactions with MIC. But there is no evidence that Miller (or, for that matter, Galan) shared that motive, or that Miller *agreed* with Jurado to launder money. The evidence suggests that Miller's motive in his dealings with Jurado (as in his dealings with the Stepanyans) was to obtain prescription drugs from a supplier and to pay for those drugs by wiring money to whatever account the supplier designated--nothing more and nothing less. The evidence simply does not support the money laundering gloss that the government places on these commercial transactions.

### D. The Beach House.

The government's argument concerning the alleged beach house money laundering agreement rests on a legal error: it contends that deliberate ignorance suffices to establish the agreement element of the alleged conspiracy. In particular, the government contends that Ludes' deliberate ignorance of Miller's alleged purpose in paying for the beach house through WJ Capital suffices to show that Ludes agreed with Miller to launder money. Doc. 1920 at 15.

Courts have held, however, that deliberate ignorance does not suffice to prove the agreement element of a conspiracy charge. *See, e.g., United States v. Ferrarini*, 219 F.3d 145, 155 (2d Cir. 2000) ("Conscious avoidance may not be used to support a finding as to . . . intent to participate in a conspiracy."); *United States v. Ciambrone*, 787 F.2d 799, 810 (2d Cir. 1986) ("Conscious avoidance of participating in a conspiracy and agreeing to be a member of a conspiracy are mutually exclusive concepts."); *see also, e.g., United States v. Willner*, 795 F.3d 1297, 1315 (11th Cir. 2015) (deliberate ignorance instruction not appropriate "to establish that [a defendant] willfully joined in the conspiracy"); *United States v. Evans Landscaping Inc.*, 850 Fed. Appx. 942, 951 (6th Cir. 2021) (unpublished) (district court erred in instructing jury that "if it found a defendant 'had deliberately ignored a high probability that a criminal agreement existed,' it could 'find that *he knowingly and voluntarily joined that agreement*,'" because "the existence of an agreement or entry into a conspiracy

may not be proved through deliberate ignorance") (quoting district court jury instruction; emphasis added by court of appeals; second quotation omitted).

If there had been evidence that Ludes deliberately closed his eyes (which there was not), the government could have relied on a deliberate ignorance theory to establish that he knew the funds at issue were proceeds of unlawful activity (which they were not).  *See United States v. Pogosian*, 754 Fed. Appx. 545, 547 (9th Cir. 2018) (unpublished) (cited at Doc. 1920 at 15); *United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013); *Willner*, 795 F.3d at 1315; *Ferrarini*, 219 F.3d at 155.  But such knowledge (or its equivalent, deliberate ignorance) does not establish a conspiratorial agreement.  *See, e.g., United States v. Loveland*, 825 F.3d 555, 559 & n.18 (9th Cir. 2016); *United States v. Lennick*, 18 F.3d 814, 818-19 (9th Cir. 1994).  There was no evidence of any such agreement between Miller and Ludes.

## CONCLUSION

For the foregoing reasons, and for the reasons in the initial motion, the Court should enter a judgment of acquittal for Miller and MIC.  If the Court declines to enter judgment of acquittal, it should order a new trial.

Dated:  March 29, 2023

Respectfully submitted,

LAW OFFICE OF JOHN D. CLINE

By: _____/s/_____
        John D. Cline

Attorney for Defendant
DAVID MILLER

MAXWELL LAW PC

By: _____/s/_____
        K.C. Maxwell

Attorney for Defendant
MINNESOTA INDEPENDENT COOPERATIVE, INC.

# CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of March, 2023, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will serve all other parties.

/s/ John D. Cline
John D. Cline

Attorney for Defendant David Miller