1
2
3
4
5                           IN THE UNITED STATES DISTRICT COURT
6                       FOR THE NORTHERN DISTRICT OF CALIFORNIA
7

8    USA,                                        Case No. 15-cr-00234-CRB-28
9                    Plaintiff,
                                                 **ORDER DENYING MOTION FOR
10           v.                                  NEW TRIAL**
11   MILLER,
12                   Defendant.

13          A jury convicted Defendant David Miller ("Miller") and his company, Minnesota

14   Independent Cooperative ("MIC"; together, "Defendants"), on several counts of fraud

15   under 18 U.S.C. § 1341, in addition to conspiracy and RICO based on that fraud.  See

16   Verdict Form (dkt. 1839).  After trial, but before sentencing, the Supreme Court handed

17   down its opinion in Ciminelli v. United States, 598 U.S. 306 (2023), holding that the

18   "right-to-control" theory cannot form the basis for a conviction under federal fraud

19   statutes, id. at 316.  Defendants now move for a new trial in light of Ciminelli.  See Mot.

20   (dkt. 2023).  For the reasons explained below, Defendants' motion is DENIED.

21   **I.     BACKGROUND**

22          This case arises from a wide-ranging criminal conspiracy to unlawfully wholesale

23   drugs with false pedigrees.[1]  Second Superseding Indictment ("SSI") (dkt. 502).  The

24   government charged 38 defendants in connection with the conspiracy, including Miller and

25   MIC.  SSI ¶ 9.  According to the indictment, MIC, a drug wholesale business which Miller

26   owned and operated, purchased more than $157 million worth of prescription drugs

27   _____

28   [1] A drug pedigree identifies the origins of a drug, and "must state, at a minimum, from
     whom the distributor purchased the drugs."  SSI ¶ 10.

United States District Court
Northern District of California

procured from unlicensed sources.  Id. ¶ 12.  The indictment charged that Miller and his associates "were aware" that the drugs MIC purchased had not been supplied through proper channels, and that, "[i]n order to conceal the true origins of the drugs," they created "false drug pedigrees and invoices, as well as conducted MIC's drug purchases through front companies."  Id. ¶ 13.  Miller and MIC then made those false pedigrees available to their customers to deceive them into thinking that the drugs came from authorized sources when they did not.  Id. ¶ 14.

Miller was charged with the following counts: Racketeering Conspiracy under 18 U.S.C. § 1962(d) (Count 1); Conspiracy to Commit Mail and Wire Fraud under 18 U.S.C. § 1349 (Count 2); Mail Fraud under 18 U.S.C. § 1341 (Counts 3 through 12); Conspiracy to Commit Money Laundering under 18 U.S.C. § 1956(h) (Count 13); and Conspiracy to Commit Unlicensed Wholesale Distribution and False Statements under 18 U.S.C. § 371 (Count 14).[2]  See id.  MIC was charged with: Mail Fraud under 18 U.S.C. § 1341 (Counts 3 through 12); and Conspiracy to Commit Unlicensed Wholesale Distribution and False Statements under 18 U.S.C. § 371 (Count 14).  Id.

The case against Miller and MIC proceeded to trial on January 9, 2023.  See Tr. of Jury Proceedings Vol. 1 (dkt. 1805).  On January 25, 2023, a jury convicted Miller on all 14 charged counts and convicted MIC on all 11 charged counts.  See Verdict Form.

Defendants filed a post-trial motion for acquittal, or in the alternative, for a new trial, arguing in part that the Court's failure to give the Defendants' requested instructions on "scheme to defraud" and "intent to defraud" was error.  See Mot. for Acquittal (dkt. 1857).  The Court denied that motion explaining that, as to the alleged jury instruction error, the Court gave instructions consistent with Supreme Court and Ninth Circuit precedent and that the cases Defendants relied on to propose different instructions were factually distinct.  See Order on Mot. for Acquittal (dkt. 1983).

Nine days after the Court issued that order, the Supreme Court handed down its

---

[2] The government also charged Miller with identity theft, access device fraud, and bank fraud, but later dismissed those counts.  See Order Granting Mot. to Dismiss (dkt. 1529).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  decision in <u>Ciminelli v. United States</u>, 598 U.S. 306 (2023).  There, the Supreme Court

2  held that convictions under federal fraud statutes cannot be based on the "right-to-control"

3  theory.  <u>Id.</u> at 316.  This Court permitted Defendants to file a renewed motion for a new

4  trial to determine whether <u>Ciminelli</u> affects the validity of their convictions.  <u>See</u> Order on

5  Mot. for New Trial (dkt. 2015).

6          Defendants' Renewed Motion for a New Trial is at issue here.  <u>See</u> Mot.

7  Defendants argue that the Court should order a new trial for Miller and MIC on all the

8  fraud counts, as well as the counts for which fraud served as the predicate offense.[3]  For

9  Miller that means Counts 1–13, and for MIC Counts 3–12.  <u>Id.</u>  Relying on <u>Ciminelli</u>,

10  Defendants assert that the Court's failure to give each of six requested jury instructions—

11  which relate to four different elements of mail and wire fraud—is error that satisfies the

12  standard for granting a new trial under Federal Rule of Criminal Procedure 33.

13          The Court sentenced Defendants on October 13, 2023.  <u>See</u> Minute Entry (dkt.

14  2060).  At sentencing, the Court denied Defendants' motion and informed the parties that it

15  would issue an order explaining the reasons for its ruling.  <u>See</u> Tr. of Sentencing.  The

16  Court does so herein.

## II.    LEGAL STANDARD

18          A district court may vacate any judgment and grant a new trial "if the interest of

19  justice so requires."  Fed. R. Crim. P. 33(a).  Failure to give a defendant's proposed jury

20  instruction is error if the instruction was supported by the law and had some foundation in

21  the evidence.  <u>United States v. Marguet-Pillado</u>, 648 F.3d 1001, 1008 (9th Cir. 2011).

22  However, a new trial is warranted for jury instruction error only if the error affected a

23  party's substantial rights.  <u>See</u> <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838 (9th Cir. 2014);

24  <u>see also</u> <u>United States v. Mendoza</u>, No. 16-CR-00150-BLF-3, 2022 WL 958381, at *4

25  (N.D. Cal. Mar. 30, 2022).  "[A]n error in misdescribing or omitting an element of the

---

[3] The government does not dispute that Miller's convictions for racketeering conspiracy (Count 1), conspiracy to commit mail and wire fraud (Count 2), and money laundering conspiracy (Count 13) were based on underlying fraud counts.  <u>See generally</u> Opp'n to Mot.

offense in a jury instruction is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" <u>United States v. Thongsy</u>, 577 F.3d 1036, 1043 (9th Cir. 2009) (quoting <u>Neder v. United States,</u> 527 U.S. 1, 18 (1999)). The Ninth Circuit has made clear that when applying this standard, a court should consider "the jury instructions and the trial record as a whole." <u>United States v. Espino</u>, 892 F.3d 1048, 1053 (9th Cir. 2018).

## III.    DISCUSSION

Defendants argue that the Court erred by failing to give each of six proposed jury instructions. <u>See</u> Mot. at 2–3. Two of these proposed instructions relate to the "scheme to defraud" and "intent to defraud" elements of wire and mail fraud, three involve the "money or property" element, and one relates to materiality. The Court will discuss the requested instructions with their corresponding element of fraud. But first, the Court must clear up confusion regarding the breadth of the Supreme Court's holding in <u>Ciminelli</u>.

### A.    <u>United States v. Ciminelli</u>

The Supreme Court granted certiorari in <u>United States v. Ciminelli</u> to determine "whether the Second Circuit's right-to-control theory of wire fraud is a valid basis for liability" under the federal mail and wire fraud statutes. 598 U.S. at 311. The underlying conviction in <u>Ciminelli</u> involved a scheme to rig the bidding process for a state-funded development project. <u>Id.</u> at 310. Louis Ciminelli, a developer, worked with others to "tailor" the bidding process such that unique aspects of his construction company would qualify for "preferred-developer status"—basically, guaranteeing that his company was chosen as the developer for the projects in question. <u>Id.</u> Ciminelli's company was ultimately chosen for a $750 million project. <u>Id.</u>

In prosecuting Ciminelli, the government relied solely on the Second Circuit's "right-to-control" theory, under which Ciminelli was guilty of wire fraud if he participated in a "scheme to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." <u>Id.</u> at 310–11. In other words, the government argued that by secretly rigging the bidding process to favor his company, Ciminelli

4

deprived the entity who was responsible for selecting the project developer of "property"—its right to economically valuable information—which violated 18 U.S.C. § 1343.  Id. at 311.  The district court thereafter instructed the jury that the term "property" in § 1343 "includes intangible interests such as the right to control the use of one's assets." Id.  The jury found Ciminelli guilty of wire fraud and conspiracy to commit wire fraud; Ciminelli's conviction got affirmed at the Second Circuit before heading to the Supreme Court.  Id.

In its opinion, the Supreme Court explained that the federal wire fraud statute— which requires the government to prove, among other things, that "money or property" was "an object of [defendant's] fraud"—reaches "only traditional property interests."  Id. at 312, 316.  Because the "right to valuable economic information needed to make discretionary economic decisions" is not a traditional property interest, the Supreme Court held that the right-to-control theory cannot form the basis for conviction under the federal fraud statutes.  Id. at 316.

That was the extent of Ciminelli's holding—the Court's rejection of the right-to-control theory.  Nothing more.  And, notably, while this holding changed the law in the Second Circuit, the Supreme Court recognized that the Ninth Circuit "expressly repudiated" the right-to-control theory thirty years ago.  Id. at 313 n.3 (citing United States v. Bruchhausen, 977 F.2d 464, 467–469 (9th Cir. 1992)).

Based on the holding in Ciminelli, this Court now analyzes whether it erred in refusing to give six jury instructions that Defendants proposed during trial.

## B.    Scheme to Defraud; Intent to Defraud

Defendants argue that the Court should have given the following two proposed instructions on the "scheme to defraud" and "intent to defraud elements":  (1) that, "[t]o establish the existence of a scheme or plan to defraud, the government must prove beyond a reasonable doubt that the scheme or plan, if completed as intended, would cause harm to a property interest of the alleged victim"; and (2) that "an intent to defraud is an intent to deceive and cheat. . . . To prove an intent to cheat, the government must establish that the

5

defendant intended to cause loss or other harm to the alleged victim's money or property." Mot. at 11–13; see also Defendants' Proposed Jury Instructions (dkt. 1817) at 17, 21.

For the most part, Defendants' arguments as to these instructions are not new. They simply repackage the identical arguments they made in their Motion for Acquittal. See Mot. for Acquittal (dkt. 1857) at 6–8. Defendants argue here, as they did in their Motion for Acquittal, that these instructions were necessary because the government was required to prove that Defendants had the intent to cause harm or loss to the victim's property interests. See Mot. for Acquittal at 6–8; Mot. at 10–12. The Court already explained—in detail—why that argument fails for both instructions, and why the instructions the Court gave on these elements were proper. See Order on Mot. for Acquittal at 8–11. The Court will not restate its full reasoning here. However, the Court does reiterate that Defendants' proposed instructions are foreclosed by binding caselaw, which holds that the government need not show intent to cause ultimate loss or harm to the victim. Id. at 9–11 (citing Shaw v. United States, 580 U.S. 63, 67–68 (2016)).

The one new argument Defendants make (which permeates their entire motion) is that these proposed instructions were necessary to "counter" the government's fraud in the inducement theory. Mot. at 11. This argument fails on its face, as to all of Defendants' proposed instructions, because the government's theory at trial was not a contract-based fraud in the inducement theory. Rather, the government's theory was that of classic, run-of-the-mill fraud: that Miller and MIC knowingly deceived pharmacies and distributors into paying for drugs from trusted and regulated sources but gave them an inferior product—diverted drugs that that were not safely stored—in return. Miller's "object" was to "obtain [his victim's] money" by selling them drugs that they understood had met the regulatory standards indicated by the pedigrees, but which Miller knew did not. This is how the government presented the fraud at trial. See, e.g., Tr. of Jury Proceedings Vol. 2 (dkt. 1808) at 127:11–128:2; id. at 157:17–158:3; Tr. of Jury Proceedings Vol. 8 (dkt. 1842) at 1548:5–13; id. at 1553:17–22; id. at 1661:19–1662:3.

Defendants continue pressing the fact that the drugs were "genuine" and "of high

6

quality." Mot. at 10.  That misses the point.  Just because the chemical makeup of the drugs was generally sound—which is exceedingly fortunate for the victims in this case—does not mean that all characteristics of the drugs were in accordance with customers' understanding.  To the contrary, an important characteristic of these drugs was misrepresented to the customers at the time of sale: the drugs' source.  Pharmacies and distributors unwittingly purchased diverted prescription drugs that did not satisfy FDA regulations for safety and storage, rather than the properly sourced drugs that they paid for.

In any event, Defendants do not contend that <u>Ciminelli</u> is relevant to, or changes the analysis regarding, these two proposed instructions.[4]  And the Court sees no reason why it would:  <u>Ciminelli's</u> holding that fraud statutes only reach traditional property interests, <u>see</u> 598 U.S. at 314–17, has nothing to do with whether the government must prove intent to cause harm to a victim's property interests.  Put differently, the Supreme Court in <u>Ciminelli</u> simply defined "property"—it did not elaborate on what the Government must prove with respect to that property.

For the reasons above, and in the Court's Order Denying Defendants' Motion for Acquittal, the Court concludes that it correctly refused to give Defendants' proposed instructions on "scheme to defraud" and "intent to defraud."  Defendants are therefore not entitled to a new trial on the basis of these omitted instructions.

### C.    Money or Property

Defendants argue they were entitled to three proposed instructions on the "money or property" element: (1) that "[a]ccurate information about the source of the prescription drugs MIC sold to its customers does not constitute property under the mail and wire fraud statutes"; (2) that "[t]he right of MIC's customers to information they considered important in deciding whether to purchase prescription drugs from MIC, including information about

---

[4] The Court's order permitted the Defendants to renew their motion for a new trial <u>in light of</u> the Supreme Court's decision in <u>United States v. Ciminelli</u>.  Mot. on Order for New Trial.  This did not give Defendants permission to renew their motion on any basis they so chose.

United States District Court
Northern District of California

1   the source of the prescription drugs, does not constitute property under the mail and wire

2   fraud statutes"; (3) that "MIC customers who received the benefit of their bargain suffered

3   no deprivation of money or property under the mail and wire fraud statutes, even if they

4   purchased the prescription drugs without all the information they considered important to

5   the purchasing decision, and even if they would not have purchased prescription drugs

6   from MIC if they had known that information." <u>See</u> Mot. at 13–14 (citing Defendants'

7   Proposed Jury Instructions at 18–20).

8        Defendants argue that, in light of <u>Ciminelli</u>'s holding about what can constitute

9   "property" under the federal fraud statutes, these instructions were required.  They point to

10  the government's statement to the jury that "pharmacies would not have purchased from

11  MIC if they had known the pedigrees were false," contending that this may have suggested

12  to the jury that the pharmacies were cheated out "potentially valuable economic

13  information necessary to make economic decisions." <u>See</u> Mot. at 13.

14       Defendants conflate two separate issues: (1) accurate <u>information</u> about the drugs;

15  (2) the drugs <u>themselves</u> being in accordance with customers' understanding at the time of

16  sale.  It is the latter on which the government's theory rested.  The government's theory of

17  fraud was not that Defendants deprived pharmacies of accurate pedigree information;

18  rather, the fraud was that the pedigrees indicated that the <u>drugs themselves</u> were one

19  thing—which is what the customers paid for—but Miller knew the drugs were something

20  else.  That was the scheme; the customers' money was the tangible "property interest" that

21  was defrauded.  The deceit was not in the lack of information, but in not getting the

22  <u>product</u> that the victims understood they were paying for.

23       The following hypothetical helps to further clarify the distinction.  Assume that a

24  defendant <u>thinks</u> he is selling diverted drugs and keeps that information a secret from

25  pharmacies at the time of sale.  As it turns out, the drugs the pharmacies receives are

26  actually from FDA-regulated sources—and therefore, actually in accordance with the

27  customers' understanding at the time of purchase.  In that situation, charging defendants

28  with fraud would run afoul of <u>Ciminelli</u>.  Because the drugs turned out to be exactly what

the pharmacies understood they were paying for, they were not deprived of any tangible, traditional property interest.  Therefore, the only arguable deprivation would be the information the defendant failed to share with them at the time of sale, which Ciminelli holds cannot form the basis of a fraud conviction.

But, again, that is not this case.  Here, the government argued at trial that the victims gave Defendants money, based on their understanding that they would receive properly sourced and safely stored drugs, yet they received drugs that were not so.  See, e.g., Tr. of Jury Proceedings Vol. 2 (dkt. 1808) at 127:11–128:2; id. at 157:17–158:3; Tr. of Jury Proceedings Vol. 8 (dkt. 1842) at 1548:5–13; id. at 1553:17–22; id. at 1661:19–1662:3.  It is not that the victims were defrauded because they were not informed about the source of the drugs, but rather that they were defrauded because the drugs themselves—the drugs that the victims understood to be sourced from the FDA-regulated supply chain—were not what they paid for.

Defendants do seem to acknowledge this point indirectly in their brief.  See Mot. at 13 ("The government did not argue explicitly that the 'money or property' at issue was information about the source of the drugs . . . .").  But they still posit that the government's statement that the pharmacies "would not have purchased from MIC if they had known that the pedigrees were false" could have made a juror think that the pharmacies were actually cheated out of a right to information (and not any other property interest).  The Court disagrees.  As explained, see supra, the government made clear that the object of the scheme was to obtain the victims' money and sell them an inferior product without their knowledge.  The statement the Defendants point to simply supports that proposition—that is, that the false pedigree made the drugs different than what the victims believed they were paying for.  The Court is further assured in this conclusion given that, even before Ciminelli, the "right-to-control" theory was not an available basis for fraud convictions in the Ninth Circuit.  See Bruchhausen, 977 F.2d at 467–469.

In sum, while Defendants are correct that the first two proposed instructions

9

accurately state the law after <u>Ciminelli</u>,[5] they are incorrect that any of the instructions had a factual basis in the record.[6]  According to the government's theory of fraud, which was constant throughout trial, the property that the victims were deprived of was the money they spent on the diverted drugs—a tangible, traditional property interest.  There was thus no reason for the Court to instruct the jury about intangible property interests; to the contrary, giving Defendants' proposed instructions would have misled and confused the jury.  Therefore, the Court denies Defendants' attempt at a new trial based on the Court's proper refusal to give their proposed "money or property" instructions.

### D.    Materiality

Defendants argue that they were entitled to the more demanding materiality instruction they proposed: that "[a] misrepresentation is material for purposes of the conspiracy to commit mail and wire fraud . . . if it goes to the very essence of the bargain between MIC and its customer."  Mot. at 14.  At trial, the Court instructed the jury that misrepresentations were material if "they had a natural tendency to influence, or were capable of influencing, a person to part with money or property."  Jury Inst. (dkt. 1832) at 31, 32.

Defendants do not rely on the Supreme Court's opinion in <u>Ciminelli</u> to support this argument.[7]  That is because <u>Ciminelli</u> does not address—or so much as mention—the proper materiality standard to apply under federal fraud statutes.  <u>See generally</u> 598 U.S. 306.  The words "material" and "materiality" are not even found in the opinion.  <u>Id.</u>

Instead, Defendants rely on the Solicitor General's <u>brief</u> in <u>Ciminelli</u>, arguing that

---

[5] And the law in the Ninth Circuit for the past thirty years.  <u>Id.</u>

[6] The Court does not believe that Defendants' third proposed instruction for "money or property" accurately reflects <u>Ciminelli</u>'s holding.  Nevertheless, because Defendants' argument for its applicability is the same as for the other two instructions, the Court's rationale for rejecting the other instructions applies equally to this one too.

[7] Again, this is notwithstanding the fact that the Court permitted Defendants to move for a new trial based on the <u>Supreme Court's opinion in Ciminelli</u>.  Mot. on Order for New Trial.

United States District Court
Northern District of California

the Solicitor General endorsed the same higher materiality standard for fraudulent inducement cases. See Mot. at 14–15. Defendants point to the Solicitor General's characterization of the "context-dependent materiality standard" as "'demanding' and 'rigorous' in the contracting context." See id. (quoting Ciminelli, No. 21-1170, Brief for the United States at 18 (citation omitted)).

As explained, this is not a fraudulent inducement case, so Defendants' argument that a higher materiality standard applies in fraudulent inducement cases is not relevant. But even putting that to the side, this Court is not bound by what the Solicitor General argued in the Supreme Court; the Court is bound by what the Supreme Court said about those arguments. And as is apparent from Defendants' failure to cite Ciminelli, the Supreme Court did not adopt (or even mention) the materiality standard that the Solicitor General proposed. Ciminelli therefore has no effect on whether the materiality instruction this Court gave was proper.

Moreover, the Court finds that the instruction it gave was otherwise appropriate. The Court's materiality instructions for mail and wire fraud mirrored the Ninth Circuit's Model Criminal Jury Instructions. See No. 15.32, 15.35 (defining material as having "a natural tendency to influence, or [being] capable of influencing, a person to part with money or property"). Should the Ninth Circuit wish to revisit that standard and instead adopt what the Solicitor General proposed in Ciminelli, it can certainly do so. But the Court did not commit jury instruction error by giving the Ninth Circuit pattern materiality instruction where there has been no intervening change of law.[8]

## IV.   CONCLUSION

The Court's jury instructions were proper at the time of trial and remain proper after the Supreme Court's opinion in United States v. Ciminelli. Therefore, the Court DENIES Defendants Miller and MIC's motion for a new trial.

---

[8] Because the Court finds no error with regard to omitting any of the six proposed jury instructions, there is no need to determine whether any such error would have been harmless.

**IT IS SO ORDERED.**

Dated: November 6, 2023

_____

CHARLES R. BREYER
United States District Judge